IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **DRIVETIME CAR SALES COMPANY, LLC,** § § § | |
| *Plaintiff,* § § | |
| v. § § | Civil Action No. 4:24-cv-00358-P |
| **HEARTHSTONE PROPERTIES DELAWARE, LLC and WSWT1, LLC,** § § § § | |
| *Defendants.* § | |

**PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT**

Plaintiff DriveTime Car Sales Company, LLC ("DriveTime"), files this First Amended Verified Complaint against Defendants Hearthstone Properties Delaware, LLC ("Hearthstone") and WSWT1, LLC ("WSW") (collectively, "Defendants" or "Landlords"), and respectfully shows the Court as follows:

**I. INTRODUCTION**

This case presents a straightforward dispute about the interpretation and application of identical lease provisions involving different landlords, which upon information and belief, are under common ownership and/or management. Specifically, DriveTime, the "Tenant" under the leases, subleased the properties covered by the leases to its affiliate, Carvana, LLC ("Carvana"), which was expressly contemplated in the leases and of which Landlords were fully aware. The leases contained an option to extend the term, which DriveTime exercised through proper notice. However, in an attempt to extort additional monies from DriveTime, Landlords now contend DriveTime breached the leases by the subleasing to Carvana and dispute the efficacy of the notice.

By this lawsuit, DriveTime seeks a declaratory judgment that DriveTime did not default by subletting the properties covered by the leases to Carvana and that DriveTime effectively exercised its option to extend the term under the leases. Because the term under the leases expires June 30, 2024, DriveTime also seeks a preliminary injunction to maintain the status quo pending the resolution of this case.

## II. PARTIES

1. DriveTime is an Arizona limited liability company doing business in Texas, with its principal place of business located 1720 W. Rio Salado Parkway, Tempe, Arizona 85281.

2. Hearthstone is a Delaware limited liability company doing business in Texas, with its principal place of business located at 13005 Temple Avenue, City of Industry, California 91746. Hearthstone has appeared and is properly before the Court through its notice of removal.

3. WSW is a Colorado limited liability company doing business in Texas. WSW can be served by serving its registered agent, Primera Companies, Inc., at 1455 Ross Avenue, Suite 5150, Dallas, Texas 75202, or wherever it may be found.

## III. JURISDICTION AND VENUE

4. This Court may have subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the Parties may be citizens of different States. However, Plaintiff lacks sufficient information regarding the citizenship of Defendant WSW, so Plaintiff reserves the right to seek remand in the event the parties are not diverse.

5. This Court has personal jurisdiction over Defendants because they have purposefully availed themselves of, and established minimum contacts with, the State of Texas, by conducting business in Texas, and Plaintiff's claims in this lawsuit arise out of Defendants' contacts with Texas. Specifically, Defendants entered into the leases giving rise to Plaintiff's

claims involving real property in Tarrant County, Texas. By refusing to accept Plaintiff's notice to extend the lease terms, Defendants have caused foreseeable injury to Plaintiff in Texas.

6. Venue is proper in this Court under 28 U.S.C. § 1391 because the Property that is the subject of this action is located within Tarrant County, Texas. Furthermore, Section 12 of the lease, the subject of this lawsuit, mandates venue in Tarrant Couty, Texas.

## IV. FACTUAL BACKGROUND

**A.  DriveTime and Landlords enter into separate but substantially similar leases for what are essentially three contiguous pieces of property in Tarrant County, Texas.**

7. DriveTime is a car sales company that operates 149 dealerships across the nation, including 16 dealerships in Texas and employees over 500 people in Texas. Landlords are commercial landlords, which upon information and belief have common ownership.

8. In 2007, DriveTime and Hearthstone entered into a lease agreement pertaining to real property located at 1121 and 1123 Cantrell Sansom Road, Blue Mound, Texas 76131. From 2007 to 2015, the lease agreement and any amendments identified the premises as 1121 Cantrell Sansom Road, Blue Mound, Texas 76131.

9. On December 7, 2016, DriveTime and Hearthstone entered into an amendment, which now expressly included as the real property, 1121 and 1123 Cantrell Sansom Road, Blue Mound, Texas 76131.

10. On December 7, 2016, DriveTime and WSW entered into a separate lease agreement pertaining to real property located at 1051 Cantrell Sansom Road, Blue Mound, Texas 76131 a/k/a 1029 Cantrell Sansom Road, Blue Mound, Texas 76131. Both leases are substantially the same if not identical. DriveTime refers to both leases as the "Lease" and the property under both leases as the "Property" herein.

11. DriveTime operates the Property as a reconditioning center where DriveTime takes a pre-owned vehicle and sends it through multiple inspections, performs any needed repairs, and

finally, prepares the vehicle for transport to its dealerships. The Property consists of five buildings totaling approximately 146,000 square feet on 45.8 acres and accommodates thirty-plus car service bays, a full paint and body center, an automated car wash at scale, and over 8 acres of parking. Over 200 individuals are employed at the Property.

12. From 2007 to 2015, DriveTime and Defendants' managing member, Corey Schlossmann, have had a long productive and mutually beneficial relationship wherein the parties have been able to communicate without issue. DriveTime has invested millions of dollars into the Property and Defendants have collected millions of dollars in rent over the course of the Lease.

13. Sadly, in October 2015, Mr. Schlossmann passed away and PARKER, MILLIKEN, CLARK, O'HARA & SAMUELIAN, a California firm, was appointed as Trustee and began managing Landlord's business operations from California (the "Trustee"). On behalf of the Trustee, Richard D. Robins became the primary contact for communications between Landlords and DriveTime.

**B.    DriveTime forms an affiliate, Carvana, and the parties begin discussing whether to include Carvana in their business relationship.**

14. In 2010, DriveTime created Carvana as an affiliate under common ownership. Carvana sells cars 100% online. In 2017, Carvana became a public company. DriveTime and Carvana, are and at all times have been controlled by a common ultimate shareholder, all of which is publicly disclosed.

15. Beginning in or around July 2016 and continuing for the following five (5) months, DriveTime, Carvana, and Landlords began discussing, among other potential business transactions, adding Carvana as tenant under the Leases.

16. An agreement was reached where DriveTime would continue to be the tenant under the lease agreement, but it would have the right, among other things, to sublease or transfer the Leases to its affiliates, including Carvana.

17.     Accordingly (and as mentioned above), DriveTime and Landlords entered into an Amended and Restated Lease Agreement on December 7, 2016, as amended, pertaining to the Property.[1]

**C.     DriveTime's transfer to Carvana under Section 7 of the Lease.**

18.     At the time the parties entered into the Lease in 2016, Defendants knew that the sole purpose of DriveTime entering into the Lease was for it to sublease or transfer the Lease to Carvana who was occupying the Property. In fact, Landlords negotiated directly with Carvana but because, at the time, it was a relatively new company, Landlords were hesitant to contract directly and preferred to have DriveTime remain the primary Tenant with an unfettered right to sublease to its affiliates, which included Carvana. Further, during the term of the Lease, Landlords actively participated in direct negotiations with Carvana, received Lease payments directly from Carvana, and cooperatively worked with Carvana on repairs of the Premises. Indeed, Landlords have had hundreds of communications directly with Carvana, completed Carvana vendor packets, and even entered into ACH payment agreements directly with Carvana (on Carvana's letterhead no less) to facilitate rent payments under the Lease:

---

[1]   One lease was subsequently amended on January 26, 2018, but the amendment has no bearing on the declarations DriveTime seeks in this lawsuit.

**PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT**                                                                    **PAGE 5**



19. Further, the Lease was specifically drafted with this in mind as the Lease specifically allows for such transfers without Landlords' consent. Section 7 of the Lease outlines permitted "Tenant Transfers." Specifically, Section 7.1.1 of the Lease specifies, in relevant part, that DriveTime does not need Landlords' written consent before transferring to *an affiliate or successor*.

> 7.1.1 Other than a transfer to an affiliate or successor of Tenant, or a Qualified Transfer (as defined in Section 7.1.4) to Carvana, LLC, an Arizona limited liability ("Carvana"), Tenant may not assign this Lease, nor sublease the Property or any part thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. As used herein, "affiliate" shall mean any entity that (a) acquires all or substantially all of the stock or assets of Tenant, (b) is the resulting entity of a merger or consolidation of Tenant with another entity, or (c) an entity which is controlled by, controls, or is under common control with, Tenant.

20. Section 7.1.1 defines the term "affiliate" as "any entity that (a) acquires all or substantially all of the stock or assets of Tenant, (b) is the resulting entity of a merger or consolidation of Tenant with another entity, or (c) an entity which is controlled by, controls, or is under common control with, Tenant." Here, Carvana was an affiliate at the time the parties entered into the amended Lease and remains today under common control with DriveTime. Accordingly,

and as intended by the parties from the onset, DriveTime could, without Landlords' consent, transfer the Lease to Carvana.

21. Landlords have since taken the position that Carvana cannot be an affiliate under Section 7.1.1 because "the Lease specifically addressed the requirements for transfers to Carvana" in the second transfer mechanism under Section 7.1.4. This argument fails because it ignores the entirety of Section 7.1. Specifically, the Lease makes a distinction between a transfer (assignment or subletting) and a Qualified Transfer. Depending on the transfer type, DriveTime either remained liable under the Lease or was released from its lease obligations.

22. If only an assignment or sublease, Section 7.1.3 specifies that DriveTime would remain subject to certain conditions, including remaining "primarily and fully liable under the terms of the Lease, *except as provided in Section 7.1.4*."

> 7.1.3 Subleases and assignments by Tenant are also subject to: (a) the terms of this Lease; (b) the term not extending beyond the Lease Term; (c) Tenant shall remain and continue to remain primarily and fully liable hereunder (except as otherwise provided in Section 7.1.4); and (d) any consent by Landlord to a particular assignment or sublease shall not constitute Landlord's consent to any other or subsequent assignment or sublease.

23. Section 7.1.4 details the requirements for a Qualified Transfer. Notably, if the lease transfer is a Qualified Transfer, Section 7.1.4 specifies that DriveTime "shall be released from all obligations under the Lease."

> 7.1.4 Tenant may assign the Lease to Carvana, without the prior written consent of Landlord provided all of the following conditions are met (a "Qualified Transfer").
>
> (a) Carvana becomes a public company and has a market value at date of assignment of not less than $1,000,000,000 based on bona fide sale of stock or membership interests.
> (b) Carvana has at date of assignment and maintains a tangible net worth determined in accordance with GAAP of not less than $100,000,000.
> (c) Carvana has at date of assignment and maintains net liquidity of not less than $5,000,000.
> (d) In the event of a Qualified Transfer to Carvana, Tenant shall be released from all obligations under this Lease accruing on or after the effective date of the Transfer provided that Carvana executes an assumption for the benefit of Landlord of all of Tenant's obligations under the Lease accruing from and after the effective date of the transfer.

24. Accordingly, the Lease provides two transfer mechanisms to Carvana. DriveTime could simply transfer the Lease to Carvana under (a) Section 7.1.1 without a full liability release; or (b) Section 7.1.4 with a full liability release. Contrary to Landlords' position, DriveTime properly transferred the Lease to Carvana under Section 7.1.1 and was never in default.

**D. DriveTime timely extends the Lease term, but Landlords improperly refuse to accept the extension.**

25. Under Section 2.1 of the Lease, the Lease is set to expire on June 30, 2024, unless the Lease is sooner terminated or extended. According to Section 2.1 of the Lease, DriveTime could extend the Lease by *giving* written notice 180 days before the Lease's original termination date (June 30, 2024).

> **2.1 Term.** Tenant shall have and hold the Property for an initial term (herein called the "Initial Term") commencing on the later of (a) the Lease Date, or (b) **December 7, 2016** (the "Commencement Date") and ending at midnight on **June 30, 2024** (the "Expiration Date"), unless this Lease shall be sooner terminated or extended. Tenant shall have the unilateral right and option to extend this Lease for three (3) consecutive extended terms of five (5) years each (herein, collectively called the "Extended Terms" and individually, an "Extended Term" and together with the Initial Term, sometimes hereinafter called the "Term" "term of this Lease" or "term hereof"). Each Extended Term shall commence on the day immediately succeeding the expiration date of the Initial Term or the preceding Extended Term and shall end at midnight on the day immediately preceding the fifth anniversary of the first day of such Extended Term. ==Tenant may exercise each said option to extend this Lease and the Expiration Date for an Extended Term by giving written notice to that effect at least 180 days prior to the expiration of the then existing term provided, however, that Tenant may not exercise such option if there is then an uncured Event of Default by Tenant hereunder.==

Accordingly, DriveTime's deadline to extend the Lease was January 2, 2024.

26. On January 2, 2024, DriveTime timely gave written notice of its option to extend the Lease via email and overnight courier (the "Notice").

27. Despite receiving the timely Notice, Landlords have refused to accept DriveTime's extension, claiming that (a) DriveTime was in default at the time for the purported sublease to Carvana (which is flawed for the reasons explained above); and (b) Landlords did not timely *receive* the Notice in the manner prescribed under Section 11 of the Lease. Section 11 of the Lease states that "all notices to be given to Landlords hereunder, . . . shall be delivered to Landlord at the

address stated on the first page hereof or such other address as Landlord shall designate in writing." Section 11 of the Lease further states that "[n]otices shall be deemed received on the earlier of actual receipt, three days after deposit in the U.S. mail or the first business day following the delivery to a nationally operating overnight delivery service." Although Section 11 of the Lease specifies how and when something delivered is deemed received, the Lease makes no reference to an extension notice only being effective upon receipt.

28. Here, Landlords admit that they received the Notice via email on January 2, 2024, but refuse to accept the Notice because they did not receive the physical written notice until a day later, January 3, 2024. This argument fails under the terms of the Lease and Texas law.

29. Section 2.1 of the Lease merely requires that an extension notice be **given**—not received—180 days before the Term expired.[2] DriveTime properly and timely **gave** notice on January 2, 2024, which Landlord does not dispute. No provision in the Lease requires that an extension notice be received by the deadline. The provisions specifying when something is deemed received are only applicable to portions of the Lease that specifically compute deadlines from a date of receipt.[3] Accordingly, under the express terms of the Lease, DriveTime's extension notice was timely given to Landlords.

30. Although DriveTime fully complied with Section 2.1, Texas law is also clear that strict compliance of a contract's notice requirements is not required where it is undisputed that the notice was received; substantial compliance suffices. *See, e.g., Barbier v. Barry*, 345 S.W.2d 557, 562 (Tex. App.—Dallas 1961, no writ); *Elmen Holdings, L.L.C. v. Martin Marietta Materials,*

---

[2] *Brown v. Swift-Eckrich, Inc.*, 787 S.W.2d 599, 600 (Tex. App.—El Paso 1990, writ denied) ("[W]here the parties have mutually agreed in a lease upon the use of the mail as the manner and mode for the lessee to give its written notice exercising the option, absent a provision requiring actual receipt by the lessor, the depositing of such notice, properly addressed and stamped, in the mail within the time specified in the lease is sufficient to accomplish its purpose.").

[3] *See, e.g.*, Lease § 7.1.2 (". . . within 10 days of receiving . . ."); § 9.1.1 (" . . . within 10 days following Tenant's receipt . . ."); § 10.1.2 (" . . . within thirty (3) days after receipt of such notice . . ."); 6.2 (". . . within a reasonable time after receiving notice . . .").

*Inc.*, 86 F.4th 667, 679 (5th Cir. 2023) ("Texas law is clear that notice substantially complies with the terms of a contract even when it is not delivered in the precise manner the contract contemplates.") (citations omitted); *Tex. Utilities Elec. Co. v. Aetna Cas. & Sur. Co.*, 786 S.W.2d 792, 794 (Tex. App.—Dallas 1990, writ denied) ("Like the case before us, there was no question that the notice was sent and received. We held that the notice was effective and in substantial compliance with the terms of the contract . . . . The judgment of the trial court is affirmed."); *James Constr. Group, LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 406 (Tex. 2022), *reh'g denied* (Sept. 2, 2022) ("We agree with the doctrine described and applies in these cases as a general principle of Texas law; a party's minor deviations from a contractual notice condition that do not severely impair the purpose underlying that condition and cause no prejudice do not and should not deprive that party of the benefit of its bargain.").

31. In sum, Landlords have refused to honor their contractual commitments to DriveTime. Defendants' actions are wrongful and are a breach of the Lease. DriveTime brings this action for declaratory judgment.

## V. CAUSES OF ACTION

**COUNT 1:   Declaratory Judgment**

32. DriveTime realleges and incorporates by reference the preceding paragraphs for all purposes, the same as if set forth herein.

33. Under the Texas Uniform Declaratory Judgment Act and Chapter 37 of the Texas Civil Practice and Remedies Code, this Court is able to declare the rights, status, and other legal relations of the parties to this action with respect to the Lease.

34. A real and present controversy exists between DriveTime and Landlords regarding the interpretation of the Lease and whether (1) DriveTime did not default under the Lease by transferring the Lease to Carvana without Landlords' prior written consent under Section 7, and (2) Landlords are obligated to honor DriveTime's Notice to extend the Lease.

35. Under the Texas Uniform Declaratory Judgment Act, DriveTime seeks a declaration from the Court that:

(i) the Lease is a valid and binding agreement;

(ii) DriveTime has met all conditions precedent under the Lease;

(iii) Carvana is an affiliate of DriveTime, as defined in Section 7;

(iv) because Carvana is an affiliate of DriveTime under the Lease, DriveTime did not need Landlords' prior written consent before transferring the Lease to Carvana under Section 7;

(v) DriveTime did not default under the Lease by subletting to Carvana under Section 7 without Landlords' prior written consent, and

(vi) DriveTime complied, or substantially complied with the Lease's notice requirements to extend the Lease under Section 2.1; thus, Landlords must honor DriveTime's Notice to extend the Lease.

**COUNT 2:   Anticipatory Breach of Contract – Specific Performance**

36. DriveTime realleges and incorporates by reference the preceding paragraphs for all purposes, the same as if set forth herein.

37. The Lease is a valid and binding contract between DriveTime and Landlords.

38. DriveTime performed its obligations and satisfied all conditions precedent under the Lease. Landlords, however, have absolutely repudiated their obligations under the Lease by refusing to accept the extension of the Lease term. Landlords' repudiation is without just excuse and DriveTime has been damaged as a result.

39. DriveTime has no adequate remedy of law for Landlords' anticipatory breach, because DriveTime may be forced to abandon the Property if Landlords do not honor the Notice and Lease.

40. As a direct and proximate result of Landlords' anticipatory breach of the Lease, DriveTime seeks the equitable relief of specific performance of the agreement between the parties, namely the extension of the Lease beyond June 30, 2024.

41. Accordingly, DriveTime seeks an order compelling Landlords to honor the Notice and Lease.

**COUNT 3:    Attorneys' Fees**

42. DriveTime realleges and incorporates by reference the preceding paragraphs for all purposes, the same as if set forth herein.

43. Pursuant to Texas Civil Practice and Remedies Code §§ 37.009 and 38, and Section 12 of the Lease, DriveTime is entitled to recover its reasonable and necessary attorneys' fees and costs from Defendants.

## VI. CONDITIONS PRECEDENT

44. All conditions precedent to DriveTime's claim for relief have been performed or have occurred.

## VII. INJUNCTIVE RELIEF

45. DriveTime repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

46. Pursuant to Federal Rule of Civil Procedure 65 and in order to preserve the status quo during the pendency of this action, DriveTime seeks injunctive relief.

47. DriveTime has a substantial likelihood of success on the merits and a probable right of recovery. Defendants' attempted cancellation of the Lease is legally unsupportable. DriveTime is not in default, and DriveTime properly notified Defendants they were exercising their right to extend. DriveTime is thus entitled to a declaratory judgment to that effect as requested herein.

48. As a proximate cause of Defendants' unlawful conduct as described above, if allowed to cancel and/or terminate the Lease in the manner described, DriveTime will suffer damages that cannot be reasonably ascertained at present. If Defendants are allowed to declare DriveTime in default of the Lease and terminate the Lease, as Defendants have already threatened to do, there is no question that DriveTime will suffer immediate and irreparable harm. If the Lease

terminates, DriveTime will lose access to one its largest facilities of this kind; a facility that houses thousands of vehicles and services hundreds of vehicles every day. In addition to divesting DriveTime of its investment in the Property, forcing a premature eviction would necessitate immediately transporting over 4,000 vehicles, moving heavy machinery associated with its operations, relocating sensitive materials required for its operations, and immediately displace hundreds of employees. DriveTime would estimate it would take six-plus months for DriveTime to be able to safely and completely vacate the Property with hundreds of Texas employees without a job during this time. Indeed, if Defendants are permitted to terminate the Lease while the parties litigate Landlords' wrongful default and termination, DriveTime will be unable to fulfill existing orders, will be unable to accept future orders, and will suffer irreparable harm to its reputation in the community. Indeed, Defendants have admitted their awareness of this harm, and made clear it is what forms the underlying basis of their attempts to renegotiate the Leases and leverage DriveTime into paying more for its existing Leases. Where a defendant's conduct would interfere with the market established by a plaintiff ***and divert business*** from the plaintiff, an injunction is appropriate. *Inter/Natl. Rental Ins. Services, Inc. v. Albrecht*, No. 4:11-CV-00853, 2012 WL 642809, at *5 (E.D. Tex. Feb. 28, 2012) ("Absent an injunction, [Defendant's] conduct would leave [Plaintiff] with no adequate remedy at law because [Plaintiff] will lose business and goodwill . . . .").

49. Such actions by Defendants would be especially problematic considering the relief requested by DriveTime in this lawsuit would resolve whether or not DriveTime is in default of the Lease as Defendants have wrongfully claimed. Unless restrained by this Court, Defendants will proceed with an improper and unlawful termination, which wholly interferes with DriveTime's access to the Property and therefore its entire business operations. DriveTime will be immediately and irreparably harmed as a result. Injunctive relief is fully warranted due to the

prospective harm and damages flowing from the Defendants' actions—damages that are difficult to calculate and ascertain.

50. DriveTime is threatened with probable, imminent and irreparable injury should Defendants not be enjoined from canceling the leases and rejecting DriveTime's exercise of its right to extend. Defendants' course of conduct threatens probable, imminent and irreparable injury because it will impair DriveTime's business reputation and goodwill in the marketplace.

51. The injury that DriveTime faces if injunctive relief is not granted outweighs any injury that would be sustained by Defendants as a result of the granting of injunctive relief. Defendants' agreement for DriveTime to continue to lease the premises is necessary to allow Carvana to continue its business operations, including employing hundreds of people and serving tens of thousands of its Texas customers from the Tarrant County, Texas Property. Defendants will continue to receive monthly the tens of thousands in rental payments just as expressly negotiated under the Leases while the status quo is maintained, so any harm to Defendants is outweighed by the harm DriveTime faces. Moreover, Defendants do not have a replacement tenant as there is simply no other entity in the DFW metroplex that can operate a similar business being operated at the Property. It will take a tremendous amount of time and effort by Defendants to convert the Property for a different use.

52. Granting injunctive relief to DriveTime will not adversely affect the public interest. The public interest will be greatly benefited by a grant of injunctive relief since such relief will (a) allow Carvana to continue to provide uninterrupted services and employment to the Tarrant County public, and (b) promote the public interest in commercial integrity and protection of legal and property rights.

53. The damages attributable to intangibles such as DriveTime's disruption of its business, its loss of customer goodwill and reputation in the marketplace and its loss of customers and market are inherently difficult to measure. Thus, no adequate remedy at law exists.

54. Because Defendants are treating DriveTime as a tenant in default and not having exercised its right to extend the term of the leases, DriveTime will file an application seeking a preliminary injunction and request that the Court enjoin Defendants including their employers, agents, servants, employees, independent contractors, attorneys, representatives, and those persons or entities in active concert or participation with them (collectively, the "Enjoined Parties") from attempting to evict, lockout, or otherwise deprive DriveTime of its uninterrupted use of the Property pending the resolution of this lawsuit.

55. DriveTime is willing to post a reasonable bond if injunctive relief is granted.

## VIII. PRAYER

WHEREFORE, DriveTime respectfully requests that this Court, upon final disposition of this matter, enter judgment against Landlords for the following relief:

(A) After notice and a hearing, a preliminary injunction be issued enjoining and restraining Defendants their employers, agents, servants, employees, independent contractors, affiliates, attorneys, and representatives from attempting to evict, lockout, or otherwise interfere with DriveTime's right to possess and uninterrupted use of the Property;

(B) Specific performance of Landlords' obligations under the Section 2 of the Lease;

(C) An order ordering Landlords to specially perform under the Lease and honor the Notice, so that the Lease be extended beyond June 30, 2024;

(D) A declaratory judgment that (i) the Lease is a valid and binding agreement; (ii) DriveTime has met all conditions precedent under the Lease; (iii) Carvana is an affiliate of DriveTime, as defined in Section 7; (iv) because Carvana is an affiliate of DriveTime under the Lease, DriveTime did not need Landlords' prior written consent before transferring the Lease to Carvana under Section 7; (v) DriveTime did not default under the Lease by transferring the Lease to Carvana under Section

7 without Landlords' prior written consent, (vi) DriveTime complied, or substantially complied with the Lease's notice requirements to extend the Lease under Section 2.1; thus, Landlords must honor DriveTime's Notice to extend the Lease;

(E)   DriveTime's reasonable attorneys' fees and expenses incurred in the filing and prosecution of this action, as well as pre- and post-judgment interest, as allowed by law;

(F)   All costs of court;

(G)   Any and all costs and reasonable attorneys' fees incurred in any and all related appeals and collateral actions (if any); and

(H)   Such other relief to which is Court deems DriveTime is justly entitled.

Dated: April 25, 2024.

Respectfully submitted,

*/s/ Schyler P. Parker*
Morgan Meyer
State Bar No. 24013161
*morgan.meyer@wickphillips.com*
Schyler P. Parker
State Bar No. 24092937
*schyler.parker@wickphillips.com*
Colin P. Benton
State Bar No. 24095523
*colin.benton@wickphillips.com*

**WICK PHILLIPS GOULD & MARTIN LLP**
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone:   817.332.7788
Fax:              817.332.7789

**ATTORNEYS FOR PLAINTIFF DRIVETIME CARE SALES COMPANY, LLC**

## CERTIFICATE OF SERVICE

      I hereby certify that on April 25, 2024, the foregoing instrument was filed electronically with the Clerk of Court using the CM/ECF system which will electronically mail notification of such filing to all counsel of record who have appeared in this case.

                                */s/ Colin P. Benton*
                                Colin P. Benton

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **DRIVETIME CAR SALES COMPANY, LLC,** | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Civil Action No. 4:24-cv-00358-P |
| **HEARTHSTONE PROPERTIES DELAWARE, LLC and WSWT1, LLC,** | § § § § | |
| *Defendants.* | § § | |

## VERIFICATION

I, Dan Packowski, hereby verify, pursuant to 28 U.S.C. § 1746, that I am the Vice President of DriveTime Car Sales Company, LLC, that in my capacity as Vice President, I am familiar with the factual matters in dispute in this lawsuit, that I have read the foregoing Plaintiff's Verified First Amended Complaint and Request for Preliminary Injunction, and that to the best of my knowledge, the facts stated in Section III, "Factual Background" are within my personal knowledge and are true and correct, except as to matters stated to be upon information and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April __25__, 2024.

_____
Dan Packowski

**VERIFICATION TO PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT**